IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
CASE NO.:

| | | |
|---|---|---|
| DURHAM PUBLIC SCHOOLS | ) | |
| BOARD OF EDUCATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| O.V., a minor, by and through his parents, | ) | |
| P.V. and M.P., | ) | |
| | ) | |
| Defendants. | ) | |

## I. INTRODUCTION

1. This is an action seeking relief from the State Hearing Review Officer's partial reversal of the Administrative Law Judge's decision dismissing all of the petitioners' claims with prejudice in the underlying administrative hearing.

2. This case arises under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and parallel state law, Chapter 115C, Article 9. The Durham Public Schools Board of Education ("Board") brings this action to challenge certain portions of the decision of the State Hearing Review Officer rendered in the administrative proceedings conducted in this matter under 20 U.S.C. § 1415(g)(2).

3. The Board challenges the Review Officer's determination that it did not offer a free appropriate public education in the least restrictive environment to Orion Varlashkin ("O.V.") in the IEP developed on May 20, 2015.

4. Within the issue regarding the appropriateness of the May 20, 2015 IEP, the Board contests the Review Officer's reversal of the Administrative Law Judge's credibility determinations, particularly regarding expert witness Dr. Jennifer Kurth, the Review Officer's reversal of the Administrative Law Judge's findings and conclusions regarding progress monitoring data and the interpretation thereof,

and other portions of the decision in which the Review Officer considered inappropriate or inadmissible evidence or did not give due weight to the Administrative Law Judge's findings.

5. The Board brings this action as an aggrieved party seeking review by this Court pursuant to 20 U.S.C. § 1415(i)(2)(A).

## II.    JURISDICTION & VENUE

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

2. All appropriate administrative remedies have been exhausted with respect to the issues presented by the Board. A local due process hearing was conducted by an Administrative Law Judge over fourteen days between February 16, 2016 and August 30, 2016. The Administrative Law Judge rendered her decision on February 21, 2017. The parents filed an appeal to a State Hearing Review Officer, who issued a decision on April 26, 2017.

3. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

## III.    THE PARTIES

4. Plaintiff is the Durham Public Schools Board of Education ("Board"), a body corporate, organized and operating under the General Statutes of North Carolina. The Board is a Local Educational Agency under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, responsible under federal and state laws for provision of a free appropriate public education to students with disabilities.

5. Defendant O.V. is an IDEA-eligible student who attended the Durham Public Schools until November 2015. O.V. is, and at all relevant times was, a citizen and resident of North Carolina.

6. Defendants Minh Pham ("M.P.") and Peter Varlashkin ("P.V.") are the natural parents of O.V. M.P. and P.V. are, and at all relevant times were, citizens and

2

residents of North Carolina. O.V., M.P., and P.V. will be collectively referred to as "O.V." in this Complaint.

## IV.     PROCEDURAL BACKGROUND

7.  On June 13, 2014, O.V.'s IEP team conducted an annual review and developed an IEP for the upcoming 2014-15 school year (hereafter "June 2014 IEP").

8.  M.P. and P.V. requested mediation regarding the placement decision memorialized in the June 2014 IEP. The parties attended mediation on July 22, 2014 and agreed to a modification of O.V.'s service delivery plan within the IEP.

9.  On August 21, 2014, O.V.'s IEP team reconvened for the purpose of amending the June 2014 IEP to reflect the agreement reached at the mediation.

10. On November 14, 2014, O.V. filed a petition for contested case hearing (hereafter the "2014 Petition") for the stated purpose of preserving claims during ongoing settlement negotiations.

11. On November 26, 2014, the parties entered into a settlement agreement resolving the 2014 Petition. The settlement agreement contained a release of all claims arising prior to the agreement.

12. On May 20, 2015, O.V.'s IEP team convened to conduct an annual review and develop an IEP for the upcoming 2015-16 school year (hereafter "May 2015 IEP").

13. On August 13, 2015, O.V. filed a new petition for a contested case hearing (hereafter the "2015 Petition"), challenging the program O.V. received during the 2014-15 school year and the proposed program for the 2015-16 school year.

14. O.V. invoked "stay put," so O.V. remained in his 2014-15 educational placement at the start of the 2015-16 school year.

15. M.P. and P.V. withdrew O.V. from the Durham Public Schools on or about November 9, 2015 and enrolled him at Pinewoods Montessori, a private school.

3

16. On January 6, 2016, Administrative Law Judge Augustus B. Elkins granted the Board's motion for partial summary judgment against any and all claims preceding the date of the written settlement agreement executed on November 26, 2014.

17. A hearing on the merits took place over fourteen days between February 16, 2016 and August 30, 2016. There were five issues for hearing:

    a. Whether the Board provided O.V. a FAPE from November 27, 2014 through June 12, 2015;
    b. Whether the Board provided O.V. a FAPE from June 13, 2015 to August 13, 2015;
    c. Whether the Board's proposed IEP for the 2015-16 school year (the "May 20, 2015 IEP") was appropriate;
    d. Whether the parents' unilateral private placement was appropriate; and
    e. If the ALJ found that the Board failed to provide or offer O.V. a FAPE in the LRE, what appropriate relief were the parents entitled to as a remedy?

18. Administrative Law Judge Melissa Lassiter entered her final decision on February 21, 2017, finding for the Board on all issues and dismissing all of O.V.'s claims with prejudice.

19. On March 22, 2017, O.V. appealed ALJ Lassiter's decision to a State Hearing Review Officer.

20. On April 26, 2017, the State Hearing Review Officer ("SHRO"), Lisa Lukasik, affirmed ALJ Lassiter's decision on three of the five issues at hearing: the provision of a FAPE from November 27, 2014 to June 12, 2015, the provision of a FAPE from June 13, 2015 to August 13, 2015, and the inappropriateness of the parents' unilateral private school placement. On the fourth issue, regarding the appropriateness of the proposed IEP for the 2015-16 school year, the SHRO reversed ALJ Lassiter's decision specifically on the question of least restrictive environment.

21. Because ALJ Lassiter had dismissed all claims and therefore not ordered any remedy, the SHRO remanded to ALJ Lassiter for determination on the fifth issue for hearing. The decision on remand is currently under consideration.

22. The Board, having been aggrieved by the decision of the SHRO, now files this civil action seeking relief from the SHRO's reversal of the ALJ's decision on the issue of the May 20, 2015 IEP's appropriateness.

## V. FACTS

*Background*

23. O.V. was nine years old and entering the third grade at Hillandale Elementary School at the time of the filing of the petition.

24. O.V. and his parents, M.P. and P.V., were and are domiciled in Durham County, North Carolina, within the boundaries of the Durham Public Schools.

25. O.V. had been determined eligible for special education services under the IDEA under the category of Intellectual Disability – Moderate.

26. O.V. has several relevant diagnoses, including Down Syndrome, that impact his intellectual functioning and his ability to access his education.

27. Following an annual review on June 13, 2014, between O.V.'s first and second grade year, O.V.'s parents requested mediation regarding his special education services.

28. At mediation on July 22, 2014, the parties agreed that O.V. would participate in at least 205 minutes of his school day with non-disabled peers, while receiving the remainder of his time in a special education classroom with programming designed to meet his unique needs.

29. On August 21, 2014, O.V.'s IEP team met to amend the June 2014 IEP to incorporate the terms of the mediation agreement.

*The 2014-15 IEP*

30. The IEP as revised at the August 21, 2014 meeting contained nine academic and functional goals related to speech/language, math, reading, writing, work completion and adapted physical education.

5

31. O.V. was working on counting, recognizing number sets, writing letters and numbers, identifying kindergarten sight words, identifying letter sounds, completing work in given time frames, improving his fitness and locomotion, increasing his verbal output, improving his articulation, and stating his basic personal information. Each goal contained specific benchmarks that further defined the expected tasks and progress.

32. The Administrative Law Judge found, and the State Hearing Review Officer affirmed, that the IEP's present levels and goals were appropriate.

33. The IEP as revised at the August 21, 2014 meeting included numerous supplementary aids and services in different subjects to support O.V.'s participation in both general and special education settings.

34. The Administrative Law Judge found, and the State Hearing Review Officer affirmed, that the IEP's supplementary aids and services were appropriate.

35. The IEP as revised at the August 21, 2014 meeting provided for special education service delivery as follows: Adapted Physical Education twice per week for 45 minutes in the gym, daily living skills five times per week for 30 minutes in the special education classroom, math five times per week for 60 minutes in the special education classroom, math five times per week for 15 minutes in the general education classroom, reading five times per week for 45 minutes in the special education classroom, reading five times per week for 30 minutes in the general education classroom, and writing five times per week for 35 minutes in the special education classroom.

36. The 15 minutes of specialized math instruction and 30 minutes of specialized reading instruction in the general education setting were supported by a licensed special education teacher who worked directly with O.V. during that time.

37. The IEP also provided for 30 minutes of occupational therapy once per week in the general education classroom, 30 minutes of occupational therapy once per week in the therapy room, 20 minutes of physical therapy ten times per year in the special education classroom, 15 minutes of speech/language therapy fourteen times per quarter in the general education classroom, and 60 minutes of speech/language therapy seven times per quarter in the therapy room.

38. The Administrative Law Judge found, and the State Hearing Review Officer affirmed, that the IEP's service delivery plan was appropriate and reflected O.V.'s least restrictive environment at that time.

*The 2014-15 School Year*

39. O.V.'s second grade teachers were Katie Turner in the general education classroom and Ashley Bunn in the special education classroom. He received special education services in the general education classroom from resource teachers Julie Haase and Sherri Allen. He received speech/language therapy services from Peter Reitzes.

40. Ms. Haase and Ms. Allen are both licensed, experienced special education teachers.

41. Even with the support of a 1:1 special education instructor, O.V. struggled to learn academic content or make progress on his IEP goals in the general education setting. He was reluctant to even enter the general education classroom, and often crouched on the floor with his head down or turned his chair away from the teacher. He did not engage with instruction or his peers.

42. Because he was so far behind his nondisabled peers in terms of basic academic skills, and because he struggled to access instruction in the general education setting, O.V.'s work in that setting was often completely different than that of his peers.

43. Because of difficulties with focus and attention, O.V. required near-constant redirection to stay on task and produce any tangible work product.

44. By contrast, O.V. was eager to transition to Ms. Bunn's classroom. He was described by multiple staff members as more engaged, more attentive, more productive, more social, and more verbal in the special education classroom. As a result, he required far fewer redirections to stay on task and produce work.

45. It was uncontested at the hearing, and the parties stipulated, that O.V. made progress in academics, communication, and social and functional skills during 2014-15 school year.

7

46. Evidence and testimony at the hearing made clear that O.V. gained far greater benefit from specialized instruction in the special education classroom than from the 45 minutes of specialized instruction in the general education classroom. O.V.'s parents, however, believed O.V. benefitted from specialized instruction in the general education classroom.

47. The Administrative Law Judge found, after considering various sources of information, including progress monitoring data, teacher observations, and evaluations, that O.V. did not benefit from the 45 minutes of math and reading instruction in the general education setting and obtained far greater benefit from instruction in the special education classroom.

*The Proposed 2015-16 IEP*

48. The IEP team convened for an annual review on May 20, 2015.

49. During a lengthy meeting, the team reviewed each portion of the IEP and updated the present levels, goals, and supplementary aids and services.

50. Based on its understanding that O.V. had not benefitted from the 45 minutes of specialized instruction in reading and writing that he had received in the general education classroom in 2014-15, the school staff proposed moving those 45 minutes of specialized instruction into the special education classroom with Ms. Bunn.

51. An extended discussion of the proposal, including discussion about O.V.'s performance in each setting and the increased rigor of the third grade curriculum, especially reading, writing, and math, followed. O.V.'s parents preferred to maintain the 2014-15 service delivery plan, with M.P. specifically stating that she did not care about reading, writing, or math.

52. Because consensus could not be reached, the LEA representative had to make the decision on service delivery, and chose the proposal from the school staff.

53. The IEP developed on May 20, 2015, was carefully tailored to meet O.V.'s unique needs and provided for services in the least restrictive environment appropriate for O.V. to make progress. The decision to remove O.V. from his non-disabled peers

8

for an additional 45 minutes per day was justified by the school staff's observations, progress monitoring data, and professional judgment.

54. Under this service delivery plan, O.V. would spend approximately 65% of his day in the special education classroom and 35% of his day with non-disabled peers.

*The Private Placement*

55. Because of the petition for contested case hearing filed August 13, 2015, O.V. began his third grade year under a "stay put" placement in which he continued to receive the contested 45 minutes of specialized math and reading instruction in the general education classroom with support from a licensed special education teacher.

56. Staff continued to observe that O.V. was far more successful and made much greater progress on his IEP goals in the special education classroom.

57. On or about November 9, 2015, M.P. and P.V. removed O.V. from Hillandale Elementary School and enrolled him in a private school, Pinewoods Montessori.

58. At the hearing, O.V. presented very little evidence regarding the private placement. O.V.'s teacher at Pinewoods did not testify, and no report cards or progress reports were offered into evidence.

59. The head of school for Pinewoods Montessori described the program, which was very student-directed. O.V. received no related services other than occupational therapy once a week at the parents' expense, and speech therapy once a month at the parents' expense.

60. Despite the parents' claims that O.V. was making progress at Pinewoods, the head of school stated that O.V. would need to be retained in the third grade the following year.

61. The Board's expert, Dr. Kristen Bell, observed O.V. in his private school setting. During her observation, Dr. Bell noted that O.V. spent over an hour drawing on a poster, largely by himself. He received very little direct instruction from the teacher, and what little instruction he received was not effective. The teacher redirected O.V. with even greater frequency than the teachers at Hillandale had.

9

*The Administrative Law Judge's Decision*

62. At the hearing, M.P., P.V., and the head of school testified as fact witnesses for O.V. Dr. Jennifer Kurth and Dr. Ann Marie Orlando testified as expert witnesses for O.V. O.V.'s counsel did not call any teachers or staff to testify about O.V.'s educational program or progress.

63. The Board called Ashley Bunn, Sherri Allen, and Peter Reitzes as fact witnesses. The Board also called Dr. Kristen Bell, Dr. Jennifer Heimenz, and Dr. Cathy Crossland as expert witnesses.

64. The Administrative Law Judge, Melissa Lassiter, issued her final decision on February 21, 2017 and found in the Board's favor on all issues. The decision is attached as Exhibit A.

65. In her final decision, ALJ Lassiter consistently found the Board's witnesses credible. She specifically described Dr. Heimenz as "credible" and stated that Mr. Reitzes "credibly rebutted" the claim that O.V. has childhood apraxia of speech, which has been one of O.V.'s central claims regarding O.V.'s needs. The ALJ also quoted approvingly from Dr. Crossland's expert testimony at length.

66. ALJ Lassiter also relied heavily on testimony from school staff in the final decision, noting the consistency among teacher testimony and formal evaluations, valuing "consistent testimony from the people who worked with O.V. in school every day," and calling teacher observations "critical" to understanding O.V.'s progress. These implicit credibility determinations are due just as much deference as explicit credibility determinations.

67. By contrast, ALJ Lassiter repeatedly limited the weight of O.V.'s witnesses' testimony. She cited O.V.'s experts' lack of direct knowledge of O.V. in determining that their testimony was of "limited value." She determined that Dr. Kurth's testimony "lacks credibility" due to lack of knowledge of North Carolina laws and due to internal inconsistency within her testimony. She also noted positions taken by Dr. Kurth that were incorrect as diminishing her overall credibility.

68. ALJ Lassiter also limited the value of Dr. Orlando's testimony, noting that she had testified about O.V.'s speech-language needs without having conducted her own

evaluation and that Dr. Orlando's testimony about O.V.'s need for daily speech therapy was directly contrary to the parents' position that the private school, where O.V. received speech therapy once a month, was appropriate.

69. Finally, ALJ Lassiter noted Dr. Kurth's self-contradictory testimony, in which she stated that there was "simply not enough data to make any decisions with" and that statistical analysis of the school's data would be "invalid" due to small sample size, but then proceeded to use that the same data to draw broad conclusions about O.V.'s progress and appropriate educational placement.

70. With respect to that same data, ALJ Lassiter took a measured approach. She assessed the numerical data and the competing interpretations offered by the parties, noting both the parents' contention that the data from the general education classroom reflected a higher percentage of correct responses as well as the Board's contention that the data trends showed progress in the special education setting but stagnation in the general education setting.

71. In light of witnesses from both parties testifying to the potential flaws in the numerical data and collection practices, including Dr. Kurth's statement that there was not enough data to make decisions on, ALJ Lassiter acknowledged the limits of the data's value in determining O.V.'s progress and appropriate placement.

72. Instead of relying solely on the numerical data, ALJ Lassiter stated that "numerical data alone does not define academic, social, or functional progress." She credited the school staff's observations in each setting as "critical" to an appropriate understanding of O.V.'s classroom performance, progress, and educational needs.

73. ALJ Lassiter had the opportunity to hear directly from witnesses over fourteen days of hearing, and to view the documentary evidence in the immediate context of that testimony. Based on her credibility determinations and the weight she accorded to the witness testimony and documentary evidence, and based on the records in evidence, ALJ Lassiter determined that 1) the Board had provided O.V. a FAPE in the least restrictive environment for the 2014-15 school year, 2) the Board had not denied O.V. a FAPE when it denied ESY services for the summer of 2015, 3) the Board's proposed IEP for the 2015-16 school year was appropriate, and 4) the private placement was not appropriate.

11

74. The Board was declared the prevailing party on all issues.

*The State Hearing Review Officer's Decision*

75. O.V. appealed the Administrative Law Judge's decision to the State Hearing Review Officer (SHRO).

76. The parties submitted written arguments to the SHRO on April 5, 2017.

77. On April 26, 2017, the parties received the SHRO's decision. That decision is attached as Exhibit B.

78. The SHRO affirmed the ALJ's decisions that the Board had provided FAPE in the 2014-15 school year, had not denied FAPE by denying ESY services in the summer of 2015, and that the parents' unilateral private placement was not appropriate.

79. However, the SHRO reversed the ALJ's decision on the appropriateness of the proposed IEP for the 2015-16 school year, determining that it did not offer educational placement reflecting O.V.'s least restrictive environment.

80. Even in finding the placement decision inappropriate based on the change in location of 45 minutes of specialized instruction, the SHRO did not alter or amend the ALJ's findings that the remainder of the IEP was appropriate for O.V.

81. In order to conclude that the 2015-16 IEP did not offer placement in O.V.'s least restrictive environment, the SHRO completely disregarded the ALJ's credibility determinations, particularly with respect to Dr. Kurth.

82. The SHRO declared Dr. Kurth to be a "prolific" and "thoughtful" academic whose mistakes and misstatements at the hearing could be set aside because she was a first-time expert witness. While attacking several specific factual findings that gave examples of why ALJ Lassiter had found Dr. Kurth to have limited credibility, the SHRO overlooked numerous other findings by ALJ Lassiter indicating why she found that Dr. Kurth's testimony carried little weight.

12

83. The SHRO also engaged in extensive review of the numerical data, even reporting on her own statistical analysis of the data, which even Dr. Kurth, O.V.'s primary expert witness, had testified would be "invalid." Based on her attempted rehabilitation of Dr. Kurth's testimony, her own numerical analysis of the data, and her unjustified dismissal of the extensive teacher testimony regarding O.V.'s performance in the general education classroom, the SHRO reversed ALJ Lassiter's finding that the IEP team's decision to move 45 minutes of core academic instruction to the special education classroom was justified and appropriate.

84. Based on her disagreement regarding the appropriate provision of those 45 minutes of instruction, the SHRO concluded that the May 20, 2015 IEP did not offer instruction in O.V.'s least restrictive environment, and therefore that the IEP denied him a FAPE.

85. The SHRO did not reverse any other findings regarding the May 20, 2015 IEP other than the question of where O.V. should receive the contested 45 minutes of specialized instruction.

86. Because ALJ Lassiter had decided in the Board's favor on all issues, she did not provide for any relief for O.V. The SHRO, having reversed on one issue, remanded to ALJ Lassiter to assign a remedy.

87. In part because the SHRO did not give due weight to the ALJ's findings and inappropriately disregarded the ALJ's credibility determinations based on a review of the cold record, the SHRO's decision regarding the May 20, 2015 IEP is incorrect and should not be upheld.

## VI. CLAIM FOR RELIEF

88. The Board seeks relief from the State Hearing Review Officer's decision to reverse the Administrative Law Judge's decision on the issue of the appropriateness of the May 20, 2015 IEP.

89. The Review Officer's decision improperly disregards the credibility determinations of the Administrative Law Judge, improperly includes her own numerical analysis of data presented at the hearing that no witness performed, and

generally fails to give due weight to the factual findings of the Administrative Law Judge.

90. The Board established at the hearing before the ALJ that O.V was offered a free appropriate public education in the least restrictive environment in the May 20, 2015 IEP. The ALJ found the IEP appropriate, and the SHRO incorrectly reversed the ALJ's decision on this issue.

91. The ALJ's February 21, 2017 decision was correct on all issues.

## VII.    PRAYER FOR RELIEF

The Board therefore prays the Court to:

1. Find that the February 21, 2017, decision of the Administrative Law Judge in this matter was correct in all respects.

2. Find that the May 20, 2015 IEP offered O.V. a free appropriate public education in the least restrictive environment appropriate for O.V.

3. Declare the Board the prevailing party on all issues.

This the 25th day of July, 2017.

<div style="margin-left:45%">

/s/ Stephen G. Rawson
Stephen G. Rawson
NC State Bar Number 41542
Colin Shive
NC State Bar Number 43202
Attorneys for Plaintiff
THARRINGTON SMITH, L.L.P.
PO BOX 1151
Raleigh, NC 27602-1151
Tel. 919.821.4711
Fax. 919.829.1583
srawson@tharringtonsmith.com
cshive@tharringtonsmith.com

</div>

14